**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA**

| | |
|---|---|
| In re | |
| **STEVE CAVANAUGH LIMITED PARTNERSHIP**, | Case No. **08-61002-11** |
| Debtor. | |
| **BROADWATER COUNTY, A POLITICAL SUBDIVISION OF THE STATE OF MONTANA**, | |
| Plaintiff. | |
| -vs- | |
| **BANK OF THE ROCKIES, N.A., ROLLING GLEN RANCH CORPORATION, STEVE CAVANAUGH LIMITED PARTNERSHIP, STEVEN L CAVANAUGH, SUSAN L CAVANAUGH, ET AL.,** | Adv No. **08-00059** |
| Defendants. | |

# MEMORANDUM  OF  DECISION

At Butte in said District this 26th day of October, 2009.

1

On July 26, 2009, Defendant Bank of the Rockies, N.A. ("Bank") filed a motion for summary judgment, doc. 171 with supporting documents, together with a supporting brief, doc. 172, and a separate statement of undisputed facts, doc. 173, requesting judgment on the following grounds:  (1)  Broadwater County does not have a lien on the ten (10) lots that are secured by Bank of the Rockies; (2) Broadwater County has no contractual or statutory right to a lien on the lots that serve as collateral for Bank of the Rockies; (3) Broadwater County has no bases for an injunction against Bank of the Rockies to prevent foreclosure; and (4) Broadwater County has no bases to assert a breach of contract claim with respect to Bank of the Rockies.

On September 4, 2009, Plaintiff Broadwater County, a political subdivision of the State of Montana ("County"), filed a brief in opposition, doc. 182, together with a statement of disputed and additional facts with attached exhibits, doc. 183.  The County in opposition to the Bank's motion argues that the Court should abstain from ruling on the motion for the reasons stated in the County's Motion to Remand, and there are genuine issues of material fact that prevent a summary judgment.

On October 6, 2009, the parties argued their respective positions before the Court, after which the Court took the motion under advisement.  The parties also argued two other motions involving a motion by the County to remand and a motion by the Bank to compel.  The Court will issue separate orders on the other two motions, which are also under advisement.  The Court will also issue a separate confirmation order in the main case after Debtor and the Bank file a stipulation to be approved by the Court.

As historic background, this adversary proceeding commenced when Defendant Steve Cavanaugh Limited Partnership removed a pending civil case from the Montana First Judicial

District Court, Broadwater County, as Case No. DV-08-41, entitled *Broadwater County vs. Donald Neu and Janette Neu et al.*, to this Court after Debtor filed a chapter 11 bankruptcy petition on July 25, 2008.  On October 16, 2008, the County filed an amended complaint, doc. 29.  Mediation attempts have occurred in this adversary proceeding with partial success.  Prior to the filing of the amended complaint, the Bank filed an answer and amended counterclaim, doc. 19, to the original complaint.  After the County filed the amended complaint, the Bank also filed an amended answer, doc. 42, to the amended complaint and incorporated by reference its amended counterclaim, doc. 19.

After considering the motion, briefs, statement of undisputed facts and statement of disputed facts and additional facts, the Court is ready to issue its decision.  This memorandum contains the Court's findings of fact and conclusions of law.

## THE BANK'S STATEMENT OF UNDISPUTED FACTS

The Bank submits the following statement of undisputed facts.

1. Debtor granted Bank of the Rockies a lien upon ten (10) lots in the Rolling Glen Ranch Subdivision, specifically those lots identified as lots number 38, 40, 41, 32, 33, 34, 35, 37, 42, and 61. The Debtor is the owner of each of the foregoing lots. (Cavanaugh Aff. ¶ 2, Exh. A)

2. The Debtor intended to give Bank of the Rockies a first position lien upon the ten (10) lots the Debtor pledged to Bank of the Rockies as collateral for loans the Bank of the Rockies made to Debtor. (Cavanaugh Aff. ¶ 3, Exh. A)

3. Broadwater County entered into two Subdivision Improvements Agreements with Rolling Glen ranch Corporation. At the time the two Subdivision Improvements Agreements were executed and recorded, Rolling Glen Ranch Corporation did not own or have any ownership interest in any of the ten (10) lots that were pledged to Bank of the Rockies as collateral. (Cavanaugh Aff. ¶ 5, Exh. A)

4. There is no contract (written or oral) between Broadwater County and Bank of

the Rockies with respect to the ten (10) lots in the Rolling Glen Ranch Subdivision that are at issue in this litigation. (Broadwater County Admissions 1 and 2, Exh. F)

5. Bank of the Rockies was not a party to the Subdivision Improvements Agreements dated February 13, 2006, that are related to this Declaratory Judgment Action. (Broadwater County Admission No. 5, Exh. F)

6. Broadwater County admits that only "the Developer" (Rolling Glen Ranch Corporation) signed the Subdivision Improvements Agreements. (Broadwater County Admission No. 36, Exh. F)

7. Broadwater County admits that it has no evidence to establish that Rolling Glen Ranch Corporation was the owner of any of the real property in the Rolling Glen Ranch Subdivision when the Subdivision Improvements Agreements were executed and recorded. (Broadwater County Admission No. 57, Exh. F)

8. Broadwater County claims that "The sum of $10,500.00 should have been paid to the County on each occasion that a lot was pledged to the Bank as Security" Request No. 10 Interrogatory, Exh. F)

9. The Debtor, Steve Cavanaugh Limited Partnership, was not a party to the two Subdivision Improvements Agreements. (Steve Cavanaugh Aff. ¶ 5, Exh. A)

10. When it executed the two Subdivision Improvements Agreements, Rolling Glen Ranch Corporation did not intend to give Broadwater County a lien upon the ten (10) lots that Debtor pledged to Bank of the Rockies as collateral. (Steve Cavanaugh Aff. ¶ 7, Exh. A)

11. There is no language in the Subdivision Improvements Agreements that creates a lien against the ten (10) lots that were pledged to Bank of the Rockies as collateral. (Exh. B);

12. The Subdivision Improvements Agreements contained explicit language identifying the rights of Broadwater County in the event of a default, see Exh. B. Subdivision Improvements Agreements stated[:]

> "15. Local Government, Rights Upon Default:
>
> > A. Upon the occurrence of an event of default, the County may draw on Developer's financial guarantee (sic) to the extent of the face amount of the Guarantee (sic) less the estimated costs (as

shown in Attachment B) of all of the improvements previously certified by the County. The County shall have the right to complete improvements itself or contract with a third party for completion, or the County may assign the proceeds of Developer's financial guarantee (sic) to a subsequent Developer who has acquired the Subdivision and who does have the same rights of completion as the County if and only if the subsequent developer agrees in writing to complete the unfinished improvements.

B. In addition, the County may suspend final plat approval during which time the Developer shall have no right to sell, transfer or otherwise convey lots or homes within the Subdivision without the express approval of the County or until the improvements are completed and certified by the County." (Subdivision Improvements Agreements, Exh. B)

13. Under the two Subdivision Improvements Agreements, Broadwater County's express remedies did not include asserting a lien upon lots in the Rolling Glen Ranch Subdivision and did not include foreclosing upon lots in the Rolling Glen Ranch Subdivision[.  S]ee Exh. B; (Subdivision Improvements Agreements, Exh. B)

14. In the event of a default under the two Subdivision Improvements Agreements, all of Broadwater County's remedies were against the "Developer", Rolling Glen Ranch Corporation and were not against Debtor Steve Cavanaugh Limited Partnership which was not a party to the Agreements. (Subdivision Improvements Agreements, Exh. B)

15. Broadwater County obtained a Platting Certificate (title report) on Rolling Glen Ranch Subdivision before the Subdivision Improvements Agreements were executed. The title report showed that the owner of the real property was Debtor Steve Cavanaugh Limited Partnership and not Rolling Glen Ranch Corporation. (See Platting Certificate Exh. G and Julie Lethert deposition, P. 206 L. 15-P. 209 L. 24,Exh. C)

16. The two Subdivision Improvements Agreements are based upon Broadwater County's model form for Subdivision Improvements Agreements. (Request No. 38 and 39 Admissions, Exh. F)

17. When Broadwater County negotiated the Subdivision Improvements Agreements with Rolling Glen Ranch Corporation, Broadwater County did not request or seek a security interest in or lien upon any of the ten (10) lots that Debtor pledged to Bank of the Rockies as collateral. (Cavanaugh Aff. ¶ 8, Exh. A)

18. Debtor Steve Cavanaugh Limited partnership has not granted Broadwater County a lien on the ten (10) lots that were pledged to Bank of the Rockies as collateral.  (Cavanaugh Aff. ¶ 4, Exh. A)

19. Debtor intended to give Bank of the Rockies a first position security interest in each of the ten (10) lots in order to secure repayment of the loans that Bank of the Rockies made to Debtor. (Cavanaugh Aff. ¶ 3, Exh. A)

20. One of the requirements for recording a document in Montana is the signature of the property owner. (Judy Gellespie (sic) Depo, page 24, lines 15 - 24, Exh. E)

21. When Broadwater County entered into the two Subdivision Improvements Agreements, it was looking to Rolling Glen Ranch Corporation to fund or complete the road improvements. (Julie Lethert Depo., P. 139, L. 2-5, Exh. C)

22. Broadwater County has acknowledged that it made a mistake when the Subdivision Improvements Agreements were executed. Steve Cavanaugh Limited Partnership should have been a party to the Subdivision Improvements Agreements because if (sic) was the owner of the real property. Since only Rolling Glen Ranch Corporation was a party, the Subdivision Improvements Agreements were never signed by anyone in the change of title with respect to the real property. When questioned about this, the County Planning Director testified:

> "Q. So lets say the Developer at the time these agreements was [SIC] signed did not own any lots in Rolling Glen Ranch Corporation, what would the Developer be obligated to pay for the road improvements?
>
> **A. He should not have signed it.**
>
> Q. (By Mr. James) Why?
>
> **A. Because he didn't have any legal right to sign it if he was not involved in the sale of the lots. He is using it as a financial guarantee, he will cause, you know, so much money to be paid to the County out of each lot sold and if he didn't have that legal right then he should not have signed the Agreement. If would be like me buying a lot and asking somebody else to**

6

**sign an agreement for building my driveway when you know, they didn't have the authority to even build the driveway or pay who ever built it, you know, they just shouldn't have signed it.**

Q. Something smells here, would you agree with that?

**A. It just was not properly drafted.**

Q. Is that how you would characterize it is. It wasn't properly drafted?

**A. (Nods head.)**

Q. You are not suggesting - -

**A. It wasn't accurate. (Julie Lethert Depo., P. 172 L. 16 - P. 173 L. 20, Exh. C)**

23. County Commissioner Elaine Mann has no recollection of Broadwater County having any intention to have a security interest in the lots on the Rolling Glen Ranch Subdivision in order to guarantee the construction of the roads referenced in the Subdivision Improvements Agreements. Ms. Mann testified:

"Q. As County Commissioner was it your intention to have a security interest in any of the lots in Phases 1 and 2 to guarantee that those roads would be built?

**A. I don't remember that we did." (Elaine Mann Depo., P. 126 L. 13 - 17, Exh. D)**

24. Broadwater County Commissioner Elaine Mann acknowledged that an agreement that is not signed by the property owner is not binding on the property owner:

**"A. Being the property owner is not a developer, I don't know how that would bind the property owner." (Mann Depo., P. 139 L. 25 - P. 140 L. 2, Exh. D)**

25. County Commissioner Elaine Mann acknowledged that the only person that was financially liable under the Subdivision Improvements Agreements was Rolling Glen Ranch Corporation:

7

Q. Under the Subdivision Improvements Agreements, you may have to turn back a couple of pages to look, in particular at section 4 on page 2, who is the financially responsible party?

**A. The developer.**

Q. And who is the developer again?

**A. Rolling Glen Ranch Corporation.**

Q. Under the Subdivision Improvements Agreements, Exhibits 3 and 4, is anyone else financially responsible?

**A. Not that I know of.**

Q. When you were a County Commissioner did you intend for anyone other than the, excuse me, anyone other than Rolling Glen Ranch Corporation to be financially responsible under these agreements?

**A. No." (Mann Depo., P. 144 L. 14 - P. 145 L. 4, Exh. D)**

26. Former Planning Director Julie Lethert acknowledged that Broadwater County obtained a platting certificate that verified that Debtor was the owner of the real property before the Subdivision Improvements Agreements were recorded. Ms Letheret (sic) testified:

"Q. ... can you tell us what Exhibit 6 is?

**A. It is a platting certificate or a certificate of title.**

Q. For what purpose?

**A. It just verifies who the owner of the property is.**

Q. Would this relate to the recording of the plat of Phase 2 of Rolling Glen Ranch Subdivision?

**A. Yes.**

Q. And was this recorded the same time as the SIA that we discussed earlier?

8

**A. Yes.**

Q. Who does Exhibit 6 show as the owner of the real property?

**A. Steve Cavanaugh Limited Partnership.**

Q. So this information was disclosed to Broadwater County before the Subdivision Improvements Agreements were recorded, would you agree?

**A. Yes.” (Lethert Depo., P. 206 L. 22 - P. 207 L. 18, Exh. C)**

### COUNTY'S STATEMENT OF DISPUTED AND ADDITIONAL FACTS

The County filed the following statement of disputed and additional facts.

1. The property that is the subject of this dispute is Rolling Glen Ranch Subdivision located in the south portion of Broadwater County near the Three Forks junction.

2. Steve Cavanaugh owns 100% of Rolling Glen Ranch Corporation and 48% of Steve Cavanaugh Limited Partnership. His wife owns 47% of SCLP, his daughter owns 4% and Rolling Glen Ranch Corporation is the general partner and owner of 1%. (Cavanaugh dep. at 43, 44, and 53.)

3. Cavanaugh entered into a buy-sell agreement to purchase the land from Dennis Rahn through another company, Mission Park LLC on October 30, 2003. He submitted the application for preliminary plat approval on May 27, 2004 and filed the Articles of Incorporation of Rolling Glen Ranch Corporation with the Secretary of State on May 12, 2004. (Cav. 87, 39, 98.) Closing of the Rahn transaction was conditioned on preliminary plat approval. (Cav. 94.)

4. Preliminary plat approval was obtained on August 17, 2004. (See Exhibit 33 attached to Hohn affidavit.) The closing took place on October 1, 2004 and final plat approval of Phase I was given on October 18, 2004. (Cav. 117.) On October 26, 2004 Cavanaugh created Steve Cavanaugh Limited Partnership (Cav. 51-52) and on October 27, 2004 transferred the Rahn land to SCLP (Cav. 117.)

5. There was no consideration for the transfer of land to SCLP. It was agreed that RGR Corp. would incur all expenses and develop the property. RGR Corp. hired all surveyors, engineers, road contractors. Cavanaugh was not aware of any written agreements between RGR Corp. and SCLP. (Cav. at pp. 142-146.)

6. Cavanaugh does not recall whether he told the County about the transfer to

SCLP. (Cav. 118.)

7. There were no capital contributions made by any of the limited partners of SCLP, the principal office of the limited partnership is at Cavanaugh's home and Cavanaugh was given authority to sign checks for SCLP as president of RGR Corp. (Cav. at pp. 64-66, 69, 70 and 76.)  All transfers to SCLP were gifts, there was no contribution. (Cav. at p. 55.) The limited partnership agreement sets out the general authority of the general partner at Section 6.01 stating in part:

> "6.01 General Authority of the General Partner.
>
> Subject to the specific rights given to the limited partners in this agreement, the general partner shall make all decisions respecting any matter affecting or arising out of the conduct of the business of the partnership. The general partner has the exclusive right and full authority to manage, conduct and operate the partnership business."
>
> And at Section 6.04 it is stated:
>
> "6.04 Authorization to Execute Certain Instruments.
>
> With respect to all of its obligations, powers and responsibilities under this agreement, the general partner is authorized to execute and deliver, for an on behalf of the partnership, such notes and other evidence of indebtedness, contracts, agreements, assignments, deeds, leases, loan agreements, mortgages, and other security instruments and agreements in such form, and on such terms and conditions as the general partner deems proper in its sole discretion." (Cav. depo Exhibit 14 at pp. 6-2 and 6-3.)

8. SCLP was created for tax purposes. (Cav. at pp. 50, 52.)

9. The decision as to whether the money from any lot sales would go to RGR Corp. or SCLP was determined by which of them would get the greatest tax advantage. (Cav. at pp. 156, 157.)  RGR Corp. was a Subchapter S corporation. (Cav. at pp. 157-158.) Steve Cavanaugh would take draws from the entities from time to time. There were no preset amounts. He took enough to pay his bills, travel, etc. (Cav. at pp. 158-160.)

10. Generally, when SCLP would sell a lot, it paid RGR Corp. for its expenses. Costs that needed to be paid in order to clear title would be paid by the title company. Other expenses would be paid to RGR by check. (Cav. at pp. 149-152.)

11. The conveyance of the land from RGR Corp. to SCLP was subject to the conditions of subdivision approval. (Cav. at p. 156.)

12. Although both Phase I and Phase II are shown on the same plat, SCLP could not sell Phase II lots until it received final plat approval February 13, 2006. The conditions of preliminary plat approval required the improvement or construction of certain access roads. Certain of those conditions were deferred until final approval of Phase II was requested. When those improvements had not been completed by the time Phase II final approval was requested the county planner Julie Lethert, informed Cavanaugh that the conditions of final approval of Phase II would require, among other things, a road improvement agreement for RGR's estimated portion of the construction costs and road costs. An agreement from a designated title company for the disbursement of funds from lot sales directly to Broadwater County for road improvements and a road improvement agreement for Rolling Glen Ranch Road. (Cav. dep. Exhibit 38, items 7, 8, and 10; Cav. 123, 215, 217.)

13. Cavanaugh then offered to have his attorney Joel Guthals, prepare the subdivision improvement agreements using the county suggested form. (Cav. at p. 359.) The subdivision improvement agreement was a method to defer payment for the construction costs. (Cav. at p. 361.)  Cavanaugh said that they did not have the money but "we certainly had lots we could sell to do that, we had the assets. . . ." (Cav. at p. 363.)

14. Lethert arranged to have the form emailed to Guthals who prepared the agreements. (Lethert at pp. 112-116.)

15. Cavanaugh sent copies of the proposed agreements to the County with an email of January 26, 2006 (Cav. Exhibit 48; Cav. dep. at p. 367.)

16. Cavanaugh signed the agreements but claims that he did not read them entirely. He said that if his attorney said they were ready to go then he didn't need to read them. (Cav. at p. 393.) Copies of the signed subdivision improvements agreements without exhibits are attached as identified as Exhibits 49 and 50 in the Cavanaugh deposition. [Also known as Exhibits 7 & 8 to County's Statement of Disputed and Additional Facts.].  The agreements vary slightly because they address different roads with different obligations. The Wheatland Road agreement, Exhibit 49, required payment of $310,842.56 by the developer within two years of the effective date which was February 13, 2006. Paragraph 4C provides for payment of the balance after certain credits stating:

> "C. Toward its financial guarantee (sic), developer shall cause
> $260,842.56 to be deposited into the Broadwater County escrow

11

account by remitting $6,500 from every lot sold in Rolling Glen Ranch Subdivision Phases I and II after final plat approval of Rolling Glen Ranch Subdivision Phase II. Developer shall designate Stewart Title of Bozeman to close the sales of all Rolling Glen Ranch Subdivision lots. A commitment shall be issued by Stewart Title of Bozeman providing that, as escrow agent for Rolling Glen Ranch Subdivision and Rolling Glen Ranch Corporation, Stewart Title of Bozeman will deliver $6,500 per lot from Rolling Glen Ranch Subdivision Phases I and II to Broadwater County for Wheatland Road improvements until Rolling Glen Ranch Corporation's portion of Wheatland Road improvements are paid in full. The County is restricted to collecting not more than $260,842.56 from Rolling Glen Ranch Subdivision lot sales. *Stewart Title of Bozeman will tender said funds directly to the County and maintains its obligations to do so until developer's obligations have been paid in full.*" (Emphasis in County's Statement of Disputed and Additional Facts, p. 5.)

17. Exhibits 49 and 50 also contain the following provision in the event of default:

"15. Local Government Rights Upon Default:

A. Upon the occurrence of any event of default, the county may draw on developer's financial guarantee to the extent of the face amount of the guarantee less the estimated cost (as shown in attachment B) of all improvements previously certified by the County. The County shall have the right to complete improvements itself of contract with a third party for completion, or the County may assign the proceeds of developer's financial guarantee (sic) to a subsequent developer who has acquired the subdivision and who shall have the same rights of completion as the County if and only if the subsequent developer agrees in writing to complete the unfinished improvement.

B. *In addition, the County may suspend final plat approval during which time the developer shall have no right to sell, transfer, or otherwise convey lots or homes within the subdivision without the express approval of the County or until the improvements are completed and certified by the County.*" (Emphasis in County's Statement of Disputed and Additional Facts, p. 5 - 6.)

18. A line by line comparison of the actual agreements with the county form

12

shows that Mr. Guthals read every line of the form and changed it as he felt appropriate. (Cav. 375-385.)

19. Although the County planner, Lethert, obtained a platting certificate showing that the actual owner of the property was Steve Cavanaugh Limited Partnership, she did not notice the difference in the names. (Lethert dep. at p. 209.) "I just did not know that they were two different entities."  (Lethert 210.)

20. The subdivision improvements agreements were listed under exceptions to the title on Schedule B of title reports issued by Stewart Title after February 13, 2006. The title commitments also referenced the original conditions of subdivision plat approval. (See Bank of the Rockies production responses - BR-001954 through BR-001973.)

21. Upon each sale occurring after February 13, 2006 the closing agent, Stewart Title, withheld the sum of $10,500 ($6,500 for Wheatland Road and $4,000 for Rolling Glen Ranch Road) and transmitted that amount to the County. (See, for example, Bank of the Rockies production response - BR-0002330 - BR-0002332 for settlement date of 2/15/2006 and attached settlement statement dated 3/30/2007 with copy of warranty deed for sale of Lot 54 on 3/30/2007 to Eickelberg.) (From Cavanaugh response to request for production, Exhibit 5.) Both settlement documents and the accompanying deed are signed by an authorized officer of Steve Cavanaugh Limited Partnership indicating its consent in the arrangement to withhold funds and forward funds to Broadwater County pursuant to the SIA's.

22. The County received thirteen separate payments from the title company from thirteen sales closed after February 13, 2006 in the total amount of $10,500 each ($4,000 and $6,500). (Affidavit of Rhonda Nelson.)

23. The Bank of the Rockies loans were made jointly to and guaranteed by Steve Cavanaugh Limited Partnership, Rolling Glen Ranch Corporation and Steve Cavanaugh and Susan Cavanaugh.  (See documents attached to Bank of the Rockies creditor claims.)

## STANDARD OF REVIEW

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157 and 1334.  This is a core proceeding to determine matters concerning the administration of the estate under 28 U.S.C. § 157(b)(2)(A) and the validity, extent, or priority of liens under 28

13

U.S.C. § 157(b)(2)(K).  It is well-settled that the one of the Bankruptcy Code's central purposes "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934).  This "fresh start" is, of course, for the honest but unfortunate debtor.  *Id*.  An adversary proceeding has been commenced as required under FED. R. BANKR. P. 7001(2).

## APPLICABLE LAW

### I.  SUMMARY JUDGMENT

Summary judgment is governed by FED. R. BANKR. P. 7056.  Rule 7056, incorporating FED. R. CIV. P. 56©, states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial."  *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)).  The manner in which this burden is proven depends on which party has the burden on a particular claim or defense at the time of trial.

> If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence–using any of the materials specified in Rule 56(c)–that would entitle it to a directed verdict if not controverted at trial.

14

Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery.  If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330-34, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265  (1986) (Brennan dissent) (citations omitted).  *See also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-06 (9th Cir. 2000) (discussing burdens for withstanding summary judgment).

When seeking summary judgment, the moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).  If the moving party adequately carries its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED. R. CIV. P. 56(e).  *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in dispute").  That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  Moreover, "[a] party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment."  *Far Out Prods.,*

*Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547. All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509. However, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv.*, 809 F.2d at 630 (citing *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense." *Id*.

If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied. *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986). Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence. *T.W. Elec. Serv.*, 809 F.2d at 631. In the absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

## II.  THE VALIDITY, EXTENT, OR PRIORITY OF LIEN.

Bank contends that the County does not have a lien on the ten (10) lots that are secured by Bank of the Rockies, and the County has no contractual or statutory right to a lien on the lots

16

that serve as collateral for Bank of the Rockies.  Bank further contends that no factual dispute

prevents this Court from deciding the lien issue on summary judgment.  The County contends

that genuine issues of material fact exist that prevent summary judgment on the lien issue.

MONTANA CODE ANNOTATED ("MCA") § 71-3-101 defines the term "lien."

(1) A "general lien" is one which the holder thereof is entitled to enforce as a security for the performance of all the obligations or all of a particular class of obligations which exist in his favor against the owner of the property.

(2) A "lien" is a charge imposed in some mode other than by a transfer in trust upon specific property by which it is made security for the performance of an act. Liens are either general or special.

(3) A "special lien" is one which the holder thereof can enforce only as security for the performance of a particular act or obligation and of such obligations as may be incidental thereto.

As noted not only is "lien" defined but also a "general lien" and a "special lien" are

defined.  The County claims a lien exists on the ten (10) lots in question because such lien may

merely be a charge or encumbrance on property which "submits the property to the payment of a

claim or debt."  *Madison Fork Ranch v. L & B Lodge Pole Timber Products*, 189 Mont. 292,

207, 615 P.2d 900, 909 (1980).  The County argues that "no magic words ... create a lien and we

concede that the [Special Improvement Agreements ("SIAs")] do not expressly so state.  Their

import, however, is apparent from the context and from the parties' conduct."  County Brief, p. 3.

The County next argues that maybe an equitable lien or equitable mortgage may exist based upon

*Amsterdam Lumber Inc. v. Dyksterhouse*, 179 Mont. 133, 140, 586 P.2d 705, 709 (1978).  The

County concludes that "the [SIAs] subject each lot to an obligation to pay the County a total of

$10,500.  The title company was directed to make the payment by RGR Corp. and the County."

County Brief, p. 3.

17

The Court believes this analysis requires closer examination given the terms of the SIAs, which are attached as Exhibits 7 and 8 to the County's statement of disputed and additional facts and Exhibit B submitted by Bank and the undisputed testimony of Mr. Cavanaugh and County officials. The County concedes in its Brief that no express lien exists as a result of the SIAs.

The SIAs are similar, but not identical in language. The title for each SIA is "SUBDIVISION IMPROVEMENTS AGREEMENT; GUARANTY." The SIAs vary slightly as the first line of subparagraph 4.B. and 4.C. in Exhibit 7 states "financial guaranty" and the first line of subparagraph 4.B. and 4.C. in Exhibit 8 states "financial responsibility." The agreements also vary slightly because they address different roads with different obligations. They do, however, contain essentially the same, substantive, undisputed language for paragraph 4 taken from Exhibit 8 as set forth below:

> 4. <u>Financial Responsibility and Security</u>: Developer's financial responsibility for improvements to Rolling Glen Ranch Road is $208,791.50 being 125% of the estimated cost of $167,032.80 for said improvements, subject to reduction in accordance with paragraph 3 above for road improvement and pavement work by Developer and for future developers' impact on Rolling Glen Ranch Road. To secure the performance of Developer's obligations under this Agreement including Developer's financial responsibility:
>
> A. Developer hereby guarantees delivery to the County the sum of $208,791.50 fo improvements to Rolling Glen Ranch Road should construction of the improvements not be completed within two years of the effective date ("Developers's financial guaranty").
>
> B. Toward its financial responsibility, Developer shall contribute $50,000 in cash for Rolling Glen Ranch Road improvements on or before the effective date to Broadwater County Escrow Account.
>
> C. Toward its financial responsibility, Developer shall contribute $158,791.00 into the Broadwater County Escrow Account by remitting $4,000 from every lot sold in Rolling Glen Ranch Subdivision Phases I and II after final plat approval of Rolling Glen Ranch Subdivision Phase II. Developer shall

18

designate Stewart Title of Bozeman to close the sales of all Rolling Glen Ranch Subdivision lots.  A commitment shall be issued by Stewart Title of Bozeman providing that, as escrow agent for Rolling Glen Ranch Subdivision and Rolling Glen Ranch Corporation, Stewart Title of Bozeman will deliver $4,000 per lot sale from Rolling Glen Ranch Subdivision Phases I and II to Broadwater County for Rolling Glen Ranch Road improvements until Rolling Glen Ranch Corporation's financial responsibility for Rolling Glen Ranch improvements is paid in full.  The County is restricted to collecting no more than the $158,791.50 from said lot sales.  Stewart Title of Bozeman will tender said funds directly to the County and maintains its obligations to do so until Developers obligations have been paid in full.

D.  In the event that Developer's financial guaranty has not been paid in full within two years of the effective date, Developer will pay any remaining unpaid financial guaranty to the Broadwater County Escrow Fund on the 2nd anniversary of the effective date of this Agreement.

The SIAs in paragraphs 11, 12, and 22 of Exhibit 8[1] provide:

11.  Reduction of Security: After the acceptance of any improvement, the amount that the County is entitled to draw on Developer's financial guaranty shall be reduced by an amount equal to 90 percent of the estimated cost of the improvement as shown in Attachment A.  At the request of the Developer, the County shall execute a certificate verifying the acceptance of the improvement and waiving its right to draw on Developer's financial guaranty to the extent of the amount.  Upon the certification of all of the improvements the balance that may be drawn under the credit shall be available to the County for the one-year warranty period plus an additional 90 days.

12.  Use of Proceeds: The County shall use funds drawn under Developer's financial guaranty only for the purposes of completing the improvements or correcting defects in or failure of the improvements as set forth in this Agreement.

22.  Assigns: The benefits of this agreement to the Developer may not be assigned without the express written approval of the County. . . .

In considering the foregoing contractual provisions and the undisputed testimony of Mr.

Cavanaugh, Commissioner Mann and Ms. Lethert, the definitions for liens, and the discussion in

---

[1] Exhibit 7's language varies slightly from Exhibit 8's, but not substantively.

*Dyksterhouse*, the Court concludes that a lien against the ten (10) lots at issue in this motion does not exist and was never created for the following reasons.

First, the Developer, Rolling Glen Ranch Corporation, named in the SIAs did not own the property in question at the time each SIA/Guaranty was signed and recorded. Debtor was the record owner. The transfer from Rolling Glen Ranch Corporation to Steve Cavanaugh Limited Partnership passed title and an all incidents of ownership. MCA §§ 70-1-519 and -520. A third party non-owner, who no longer has ownership or the incidents of ownership, cannot create a lien on someone else's property; only the owner of the property may create a lien. MCA § 71-3-101(1). The transferor (Rolling Glen Ranch Corporation) does not have the requisite power to hypothecate the previously transferred property to secure the performance of its obligation, in this case, to the County. MCA §§ 70-15-301 and -302

Second, even if the entity issue did not exist and prior transfer had not occurred, the SIAs contain no language wherein the Developer intended to create a lien for the road improvements. Liens are created by either contract or operation of law. *See* MCA §§ 71-3-101, 71-3-102, and 71-3-104. If a lien is created, the extent of the lien does not itself entitle the person in whose favor it exists to a lien on that property for the performance of any obligation other than that obligation to which the lien originally secured. *See* MCA § 71-3-106. The County and the Developer agreed to create a fund from which the improvements would be completed if the improvement were not otherwise constructed. Paragraph 4.A. clearly states that the Developer guarantees delivery to the County a sum certain for the improvements. Nothing within the language of paragraph 4, or for that matter any other provisions within the SIAs, states an intent by the Developer to create a lien against the lots in the subdivision for the road improvements.

20

The SIAs merely create the method for creating a fund that is funded through an escrow

agreement and commitment wherein a title company has contractually agreed to remit on behalf

of the Developer a stated amount to the County to be held in a County-created escrow account.

In the event the remittances are not made, the County can disburse from the County escrow

account whatever funds are attributable to the pertinent subdivision for the designated

improvements.  If insufficient monies are in the County escrow account for the subdivision and

the designated improvements, the Developer is in default and the agreement establishes in

paragraph 14 a method of measuring the damages for such default.

Pursuant to *Dyksterhouse*, no equitable lien exists.  "An equitable lien, or equitable

mortgage, arises when there is in existence written evidence of the intent of a grantor to subject

real property to a security interest in favor of a lender."  *Dyksterhouse*, 179 Mont. at 140, 586

P.2d at 709.  The Developer never indicated any intention of making specific property security

for the debt other than the County escrow account funded by the contractual commitment by

Stewart Title of Bozeman to remit a portion of the proceeds generated from each lot sale.

Additionally, the SIAs in their title reference "guaranty," not "security agreement."  No real

property has been hypothecated for the obligations identified in the SIAs.  Further, no defective

security interest exists.  The SIAs clearly state the contracting parties intentions and the manner

for funding the cost of the road improvements.  The provisions of paragraph 15 of the SIAs state

what happens when a default occurs and the remedies that the County has.  Those remedies do

not include foreclosing any lien on the subject real property.  The remedies involve drawing on

the unsecured financial guaranty of the Developer and having the right to complete the

improvements.  The County is requesting this Court to rewrite the SIAs to impose a security

interest and lien on the ten (10) lots secured to the Bank.  The SIAs contractually do not create a

lien.  The Court is unaware of any lien created by the operation of law. The Court will not rewrite

the SIAs when the language of the agreement is clear and explicit.  MCA § 28-3-401.  The

language of the agreement must be interpreted to "give effect to the mutual intention of the

parties . . . ."  MCA § 28-3-301.  Only when an agreement fails to express the real intentions of

the parties should such intentions be disregarded as a consequence of fraud, mistake or accident.

MCA §§28-3-304; 28-2-1611.  The undisputed facts show that Mr. Cavanaugh on behalf of

Developer never intended to create a lien in the lots for the benefit of the County for the

construction of the road improvements.  Commissioner Mann confirms that the County did not

intend the Developer to create liens on the lots to guarantee the construction of the road

improvements and further confirms through her deposition that only the Developer, Rolling Glen

Ranch Corporation, is financially liable for the road improvements through its unsecured

guaranty.  The Court will not interpret the SIAs to include terms that the parties never intended.

The County could have required specific bonding, letters of credit, liens or other means of

insuring and guaranteeing the Developer's obligation under the SIAs.  The County chose not to

do so.  The SIAs in paragraph 15 of Exhibits 7 and 8 set forth the County's rights upon

Developers default:  (1) draw on the Developer's financial guaranty or (2) suspend final plat

approval.[2]  The SIAs do not identify any rights by the County involving lien foreclosure.[3]

---

[2] The Court issues no opinion upon the appropriateness of the County to suspend the final plan as the Court understands that any prior suspension of the final plat by the County has been vacated by the County's Order dated December 22, 2008.

[3] The Court further issues no opinion upon the continuing contractual obligation of the title company and the Developer to remit money to the County after closing a lot sale when sufficient money remains after paying the Bank's lien, commissions, taxes and other closing

### III.  BREACH OF CONTRACT.

Bank requests summary judgment on an alleged breach of contract claim contained in the Amended Complaint filed by the County.  The County in its opposition brief asserts that it has not alleged such a claim against the Bank.  In reviewing the Amended Complaint, particularly, Count II - Breach of Contract, the Court finds no allegations asserting any claim against the Bank.  The County asserts claims against Rolling Glen Ranch Corporation, Steven L. Cavanaugh, Susan L. Cavanaugh, and Debtor, Steve Cavanaugh Limited Partnership.  As no alleged claims have been asserted by the County against the Bank in the Amended Complaint for breach of contract, no relief can be granted by this Court on the Bank's motion for summary judgment as it relates to a the breach of contract claim.  In closer examination, the Bank's Amended Counterclaim, doc. 19, alleges no contract exists between Bank and the County and that the Bank was not a party to the SIAs.  However, the Bank does not set forth in the prayer for relief in the Amended Counterclaim any relief for a declaration that no contract exists between the County and the Bank and consequently that no breach of contract has occurred.  The Bank's motion for summary judgment as it relates to Count II - Breach of Contract contained in the County's Amended Complaint is denied and as no declaratory relief has been requested in the Bank's Amended Counterclaim that no contract exists and consequently that no breach has occurred Bank's motion for summary judgment as it relates to the Bank's Amended Counterclaim is denied.

### CONCLUSIONS OF LAW

---

costs.  Debtor's 4th Amended Disclosure Statement and 3rd Amended Plan state the allowed claim shall be prorated equally among several lots.

1.  Rolling Glen Rock Corporation transferred all incidence of ownership to Steve Cavanaugh Limited Partnership prior to the signing and recordation of the Special Improvements Agreements; Guaranty affecting the Rolling Glen Ranch Subdivision.  MCA §§ 70-1-519, 70-1-520, 70-15-301 and 70-15-302.

2.  Rolling Glen Rock Corporation, having transferred its ownership interests in (10) lots in the Rolling Glen Ranch Subdivision, specifically those lots identified as lots number 38, 40, 41, 32, 33, 34, 35, 37, 42, and 61 to Steve Cavanaugh Limited Partnership prior to the recordation of the Special Improvements Agreements; Guaranty, could not hypothecate the described property as security for the performance of Rolling Glen Rock Corporation to construct the road improvements.  MCA §§ 70-15-302, 70-1-519 and -520, 71-3-101.

3.  The Special Improvements Agreements do not create any lien or security interest in the lots described in paragraph 2 as no intent to create a lien or security interest is contained within the written documents. *Amsterdam Lumber Inc. v. Dyksterhouse*, 179 Mont. 133, 140, 586 P.2d 705, 709 (1978).

4.  No equitable lien for the benefit of the County exists in the above described property. *Amsterdam Lumber Inc. v. Dyksterhouse*, 179 Mont. 133, 140, 586 P.2d 705, 709 (1978).

5.  Bank is not entitled to summary judgment on the issue of breach of contract as any such relief has not been requested either by the County in its Amended Complaint, Count II - Breach of Contract, or by the Bank in its Amended Counterclaim.

Based upon the foregoing discussion, the Court will issue the following separate order and judgment:

IT IS ORDERED that Bank's motion for summary judgment is partially granted and

24

partially denied; that no liens in favor of Broadwater County for road improvements exist on the

(10) lots in the Rolling Glen Ranch Subdivision, specifically those lots identified as lots number

38, 40, 41, 32, 33, 34, 35, 37, 42, and 61; and that no breach of contract claim has been asserted

against the Bank by the County and the Bank did not request any declaratory relief as to whether

a contract existed or a breach occurred upon which this Court is able to rule.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana